IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

ESTATE OF WILFORD DEWEESE,

Plaintiff,

v.

RONNIE HANCOCK,
DANIEL LEBARON,
LEVI HOOVER, and
JEFFREY SCHUELKE,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Estate of Wilford Deweese, by and through its attorneys at the Civil Rights

Litigation Group, state and allege as follows:

## INTRODUCTION

1.      This is a civil rights action seeking damages against four police officers from two

different police agencies who were involved in the unreasonable and unnecessary shooting death

of Wilford Deweese.

2.      It has been widely reported by police and the press that plaintiff Wilford Deweese

fired a gun at a police dog and at human police officers without provocation, which forced police

to fire and kill Mr. Deweese in response. Nothing could be further from the truth. Instead, the

evidence demonstrates that police first provoked violence against a peaceful and non-threatening

Mr. Deweese by sending a canine to attack him when he posed no threat to anyone, and was simply

too afraid to affirmatively walk 20 yards toward a vicious barking dog and a dangerous-looking firing squad of officers pointing their guns at him. Only after the canine was sent in to attack, and was in the process of attacking Mr. Deweese, did Mr. Deweese take out a firearm from his pocket and shoot downward and away from the officers at the canine in self-defense. When the defendants saw Mr. Deweese aim his gun down at the canine, they opened fire with a volley of 40-50 shots that riddled Mr. Deweese's body with 22 gunshot wounds. The shooting was plainly unconstitutional because the officers created their own feeling of danger by provoking Mr. Deweese to defend himself from the unnecessary threat of serious bodily injury from the canine. None of the officers were actually in danger at any time, and whatever danger that can be articulated was created by them.

3.    At the time of the canine attack that preceded the shooting, Mr. Deweese was standing perfectly still, with his hands visible, talking on a cell phone on the side of the road near a courtyard. He had remained stationary and non-threatening for 20 minutes while police officers from three different agencies surrounded him, pointed their firearms at him, and yelled commands at him. Mr. Deweese took no action to verbally or physically threaten any of the officers or people nearby. He took no action to resist or flee from any purported arrest. He merely remained idle, talking on the phone, which was clearly visible and identifiable to the officers in his hand. While talking on the phone, he offered some verbal responses to inquiries made by the officers and even showed them that he had nothing in his hands or waistband that would appear threatening to them. But police wanted Mr. Deweese to walk out to them. After just 20 minutes of waiting for him to come out, the officers simply got tired of waiting and sent the canine to attack while they "rushed" in after the dog with firearms drawn. The officers created an unreasonable danger for Mr. Deweese

that could have only ended one way.

4.     Plaintiff was a soft-spoken, 67-year-old Certified Public Accountant (CPA), who had no criminal history, lawfully carried a firearm for his protection, and was described as someone who wouldn't even kill a bug in his home. His family, through his Estate, seeks justice for the unnecessary killing, to clear Mr. Deweese's name from the false police accusations made against him, and for compensation for the physical, dignitary, emotional, and economic injuries that he suffered, including but not limited to the fatal attack and its consequences. The Estate seeks punitive damages to punish and deter this conduct from happening again.

## JURISDICTION AND VENUE

5.     Plaintiff's federal claims are brought pursuant to 42 U.S.C. §1983 and the Constitution of the United States. Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

6.     Plaintiff's state law claims are brought pursuant to C.R.S. § 13-21-131 and the Colorado Constitution.

7.     This Court has subject matter jurisdiction of the federal claims pursuant to 28 U.S.C. §1331. This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the State and District of Colorado.

9.     Jurisdiction supporting the Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988 and C.R.S. § 13-21-131(3).

## PARTIES

10.     Plaintiff incorporates by reference, as though fully set forth herein, each and every

allegation contained in the preceding paragraphs of this Complaint.

11.    Mr. Deweese (deceased) was a resident of Florida and at all times relevant to this Complaint had been temporarily staying in the State of Colorado when the events described herein took place in Manitou Springs, Colorado.

12.    The Estate of Wilford Deweese was established following his death, by his heirs and representatives, including his brother, Sam Deweese, and stepdaughter, Monica Moore. They have been legally appointed as the Personal Representatives of the Estate.

13.    Defendant Ronnie Hancock was, at all times relevant to the claims in this action, employed as a K-9 Police Handler of the dog named "Jinx" by the El Paso County Sheriff's Office, and, acted as a police officer, under color of state law. He is identified in his individual capacity.

14.    Defendant Daniel LeBaron was, at all times relevant to claims in this action, employed by the El Paso County Sheriff's Office, and acted under color of state law in his capacity as a police officer. He is identified in his individual capacity.

15.    Defendant Levi Hoover was, at all times relevant to the claims in this action, employed by the Manitou Springs Police Department and acted as a police officer, under color of state law. He is identified in his individual capacity.

16.    Defendant Jeffrey Schuelke was, at all times relevant to the claims in this action, employed by the Manitou Springs Police Department and acted as a police officer, under color of state law. He is identified in his individual capacity.

## **FACTUAL BACKGROUND**

17.    On April 11, 2022, Mr. Deweese was a 67-year-old man from Florida, who had spent a long career as a CPA.

18.    Mr. Deweese was known as being conservative – he supported the police and his right to carry a firearm for his protection.

19.    Mr. Deweese had planned a long cross-country road trip between Florida and California, to attend a family member's funeral in Santa Barbara.

20.    On the way back from California, Mr. Deweese stopped in Manitou Springs, Colorado and stayed in an AirBnB rental.

21.    Manitou Springs is a small liberal town of approximately 5,000 people, which is known for its hot springs, hippy bohemian culture, and art scene.

22.    Manitou Springs attracts many tourists, but locals do not always welcome outsiders who seem out of place or who are unfamiliar with the town's bohemian way of life.

23.    On the evening of April 11, 2022, Mr. Deweese went out to visit the sites of the town and sample its hospitality.

24.    Mr. Deweese entered a non-descript bar on the main strip called the Royal Tavern, which had tough-looking patrons inside and was referred to by witnesses as a "biker bar."

25.    At the Royal Tavern, Mr. Deweese appeared very out of place to locals. He was immediately noticeable as a "foreigner" with grey hair, and dressed in a blue and white plaid shirt, blue vest, white/khaki slacks, and a fisherman's hat.

26.    Mr. Deweese was described by witnesses as looking "upper-crusty" and "well-to-do." It was obvious he was from out of town and out of place in the bar.

27.    At the Royal Tavern, Mr. Deweese ordered a single 8 oz beer and attempted to play pool.

28.     However, Mr. Deweese encountered some difficulty when he did not understand the bar's line system for use of the pool table. Mr. Deweese stood by and waited to use the table, but had difficulty getting a turn.

29.     He talked to some patrons of the bar and attempted to make friends, but was repeatedly rebuffed.

30.     The bartender overheard him engage in a conversation in which he discussed having a bad date with someone and that the town's population was different from where he lived.

31.     The bartender, who was described by others as a "tough-looking lady," listened in to Mr. Deweese's conversation and took offense to some of the comments he made.

32.     The bartender decided not to serve Mr. Deweese any longer because of his comments.

33.     Mr. Deweese paid his tab and left peacefully.

34.     Mr. Deweese then went to another bar blocks away, called The Keg.

35.     As Mr. Deweese was about to walk inside, he made eye contact with the bartender of The Keg through the window.

36.     The bartender at The Keg took one look at Mr. Deweese and decided from his appearance that she did not want him in the bar. She shook her head when he attempted to open the door three separate times and gestured for him to leave.

37.     When Mr. Deweese persisted to enter the bar, the bartender at The Keg closed and locked the doors, telling him the business was not open for him, despite the fact that there were local patrons inside.

38.    This was the second establishment that seemed to exclude Mr. Deweese because he was an out-of-towner, foreigner, and/or because he didn't appear to fit in.

39.    Mr. Deweese began walking down the main strip on Manitou Ave. and realized he had left some of his belongings in the Royal Tavern.

40.    Mr. Deweese returned to the Royal Tavern to get his things.

41.    When Mr. Deweese walked in, he was confronted by the bartender who told him she was not going to serve him and that he had to leave.

42.    An argument erupted between the two and the bartender attempted to push him out of the establishment.

43.    A local patron, who was known for getting in physical fights, approached Mr. Deweese from behind and pushed him, knocking Mr. Deweese to the ground.

44.    Mr. Deweese stood up and attempted to pull a gun from out of his pocket to show that he could defend himself against what appeared to be an overwhelming crowd of hostiles.

45.    However, the gun in his pocket got caught on his pants.

46.    At the first sight of the weapon, the bartender yelled " he's got a gun, call 911."

47.    Mr. Deweese did not fire the weapon or otherwise physically hurt anyone.

48.    Mr. Deweese left the bar before any further problems could ensue.

49.    Someone called 911 and police were dispatched.

50.    Mr. Deweese walked several blocks down Manitou Avenue, toward a local art installation and courtyard in the center of town around 900 Manitou Ave.

51.    The art installation is centered in an open courtyard area, between two buildings.

It has a long sidewalk extending north/south from the street approximately 30-50 feet inward, connecting to a ramp with a metal railing that turned 90-degrees, and which formed a path around and leading down to the sunken courtyard. *See* image below:



52.     It was at this courtyard, on the ramp near where it turns 90-degrees, that police officers found Mr. Deweese:



53.     When they arrived, Manitou Springs police officers Defendants Hoover and Schuelke pulled their police vehicles over and parked on the street in front of Mr. Deweese, and immediately pulled out their firearms—one handgun and one rifle—and pointed them at Mr. Deweese.[1]

54.     It was dark at the time, but police shone very bright lights on Mr. Deweese that showed him clearly, as can be observed in a snapshot captured by a witness:

---

[1] See photo above.



55.    Defendant Hoover yelled out a barrage of sometimes conflicting commands,

including: stop moving, show me your hands, walk toward me, put your hands up, drop what

you're holding, do not reach for it, turn away from us, turn away, put the bag down, stop there,

just put your hands up and turn away from us, etc.

56.    Mr. Deweese yelled out to the officers that he had done nothing wrong, that he

had been assaulted, and that they had no right treating him that way.

57.    Defendant Hoover yelled out that they could not work with Mr. Deweese or listen

to his side of the story until he complied.

58.     The officers continued to move around and aim their weapons at Mr. Deweese in a threatening manner.



59.     Mr. Dewese was afraid and did not know what to do.

60.     Any person in Mr. Deweese's position would and should have been reasonably concerned for their safety with officers aiming their firearms at him in the manner they did.

61.     Mr. Deweese had been on a telephone call with a friend, seeking contact information for an attorney. He held up the phone for the officers to see, while he held a plastic bag in the other hand.

62.     Mr. Deweese showed the officers the contents of the bag, taking out a book and a

bottle so that they would not be concerned.

63.     Mr. Deweese showed that his hands were otherwise empty and had nothing threatening in them.



64.     Mr. Deweese continued to stand idle for nearly 20 minutes, moving his body to put his hands up, hold the railing for balance, lift his clothing to show he had nothing on his waistband, empty the plastic bag he held, turn away (and around) for the officers to show he had nothing in his waistband, and raise his cellphone to his ear during his continuing phone call to seek help with the situation.

65.      Mr. Deweese responded to some commands, such as showing his empty waistband, and gave responses to several questions that the officers say they could not always hear.

66.      But the officers viewed him as non-compliant because he would not affirmatively walk out toward them while they were pointing firearms at him, yelling at him, and shining bright lights on him.

67.      As Mr. Deweese stood there, non-threateningly, trying to explain to the officers that he had been assaulted and robbed and that they should leave him alone, they told him that he could spend all night there talking to them because the officers had nowhere to go.

68.      Defendant officers Hoover and Schuelke requested that additional police officers respond to Manitou Springs. In response to this request, several El Paso County Sheriff's Deputies made their way to Manitou Springs.

69.      The first additional officer to arrive was Defendant LeBaron.

70.      As Officer LeBaron was arriving, he was instructed by Officer Hoover over radio to go directly to the Royal Tavern because Hoover and Schuelke had the situation with Mr. Deweese handled.

71.      After Officer LeBaron went to the Royal Tavern, he joined Officers Hoover and Schuelke and brought along his body-length shield.

72.      Approximately 7 minutes after defendants Hoover and Schuelke first made contact with Mr. Deweese, it was aired to them by radio that an officer with a less lethal 40 mm cannon was on route to the scene.

73.      Approximately 13 minutes after officers Hoover and Schuelke made contact with

Mr. Deweese, Defendant officer Hancock arrived with his K-9 Jinx.

74.    Officer Hancock immediately began yelling commands at Mr. Deweese as Jinx

barked excitely at Mr. Deweese while pulling on his lead.

75.    All four of the Defendant officers discussed what they should do while Mr.

Deweese continued to stand idly in a non-threatening posture.

76.    The officers were not facing a tense, fast-paced, or rapidly-evolving circumstance

in which they were in danger or otherwise were forced to act hastily.

77.    The officers had plenty of time and opportunity to act reasonably in concert with

the law, police policies and training of the police agencies they were employed by.

78.    The Defendant officers had plenty of time and opportunity to discuss a plan, to

de-escalate, and consider less harmful alternatives, before they acted.



79.    Mr. Deweese stood stationary on the sidewalk path leading to the installation,

approximately 20-30 yards away from the officers, in a non-threatening manner, during almost the entirety of the interaction of approximately 20 total minutes.

80.     Eventually, Defendant Hancock got his canine out of his vehicle and took over command of the scene.

81.     Once Defendant Hancock took over, the encounter was escalated.

82.     The canine barked loudly and aggressively, and made it difficult for anyone to understand communications that followed.

83.     The canine handler yelled out that if Mr. Deweese did not walk out with his hands up, he would send the dog in to bite him.

84.     Any reasonable person would be afraid of the canine barking, the commands telling him Mr. Deweese would be bitten, and the line of officers that appeared to be threatening him with guns drawn and aimed at him like a firing squad.

85.     It is not surprising that Mr. Deweese was frozen in fear and/or did not want to walk out in this threatening environment. *See* below:



86.     Mr. Deweese had not done anything to threaten the officers up to this point. He had not displayed any firearm to the officers. He had not communicated any threats.

87.     After the officers yelled that he would be bitten if he did not walk out, he yelled clearly that he would defend himself if forced to by shooting the dog if it was sent to attack him.

88.     The Defendant officers ignored Mr. Deweese's notice and warning about defending himself.

89.     The Defendant officers eventually became impatient and tired of waiting for Mr. Deweese to affirmatively come out and walk toward them.

90.     After approximately 20 minutes of waiting, and just a few minutes since the canine officer arrived on scene, the Defendant officers, together, decided to end the situation with force and send in the dog to attack, while they "rushed" in behind the canine with only firearms ready.

91.     At the time, the officers had no reason to rush the encounter or otherwise use force

to harm him.

92.     Nevertheless, the officers' planned to use the dog to attack and bite Mr. Deweese while the officers ran in behind and used overwhelming force to disable and apprehend him, without regard for the physical consequences to Mr. Deweese and without employing other less forceful or injurious means.

93.     At the time, the officers had various forms of less-lethal options and other protective equipment, including Tasers, pepper spray, bullet-proof vests, and a ballistics shield that protected any officer that carried it from the knees up.

94.     At the time, additional officers were also coming to the scene to offer assistance that was radioed for all to hear, including that other forms of less-lethal options were on the way, specifically including a 40mm sponge/beanbag cannon that could be used to stun without causing serious injury.

95.     In fact, when the decision was made to release the dog on Mr. Deweese, an officer with the 40 mm sponge rounds had arrived on scene and was just 20 feet away with that tool and just seconds away from being ready for deployment.

96.     The officers ignored the radio traffic involving these other officers and equipment, the mechanisms of less-forceful and protective equipment they had available, and the viability of other less-forceful options.

97.     Instead, the officers decided to rely on the canine and their firearms to rush in to bite Mr. Deweese and take him forcefully.

98.     At the time the officers decided to deploy the canine to bite, Mr. Deweese

remained relatively still, idle, non-threatening, and had not moved in a manner indicating he would be likely to flee, resist arrest, or otherwise present an immediate threat to the officers or anyone else. He had remained in that position for approximately 20 minutes.

99.     The officers knew that Mr. Deweese, in fact, had nowhere to go, because the officers were blocking and guarding the main path out of the courtyard area that Mr. Deweese was on.

100.     The Defendant officers had no information indicating Mr. Deweese would threaten, flee, or resist a fair and non-threatening attempt by officers to contact him.

101.     At the time of the deployment, the El Paso County Sheriff's Office had trained and instructed its officers that canines should not be used once a suspect has been located and the person does not appear to present an immediate threat or risk of escape.

102.     As such, the officers did not have reasonable justification to order the canine to attack and bite Mr. Deweese, and they knew in advance that they lacked justification.

103.     Such use of force represented a significant quantum of force that was outside police policy.

104.     The Defendant officers ignored the training and instruction, the constitutional limitations on use of force, and actively participated in the plan to deploy the dog and rush Mr. Deweese with firearms drawn, while he stood stationary posing no threat.

105.     Despite the lack of reasonable justification, the officers deployed the canine to bite Mr. Deweese and/or otherwise failed to intervene to prevent the canine from being used without justification, and ran in coordination with the dog and the other officers to rush Mr.

Deweese with overwhelming and significant force.

106.    Although the officers armed themselves with only firearms (instead of less-lethal
alternatives), and made their use virtually inevitable, the officers failed to provide warnings that
deadly force could or would be used.

107.    As he released the dog on Mr. Deweese, Defendant Hancock yelled out for the
canine to "attack" and bite Mr. Deweese.

108.    As the dog ran up and approached Mr. Deweese, Mr. Deweese backed up a few
feet and retreated in a defensive manner.

109.    Mr. Deweese did not immediately pull out his firearm.

110.    Mr. Deweese turned his body perpendicular to the officers as he backed up his
body around the 90-degree ramp corner, and focused his attention completely on the canine who
was running up and threatening him.

111.    After the canine made the 90-degree turn with Mr. Deweese, and made clear he
was intent on attacking Mr. Deweese by lunging or biting at Mr. Deweese, Mr. Deweese pulled a
small handgun from his pocket (for the first time during the encounter), aimed low and away from
the officers – toward the attacking dog, and fired at it. *See* image below:



112.     The first shot missed the canine and Mr. Deweese fired again to try to stop the impending threat.

113.     At the time, Mr. Deweese's body was perpendicular to the officers, facing to the side and away from the officers, and the gun was pointed downward toward the dog.

114.     The officers had no reasonable basis to believe Mr. Deweese was pointing or firing the gun at any human being.

115.     While a firearm was being brandished, the officers knew that Mr. Deweese was likely only brandishing it to defend himself from the canine, due to his previous warning that he would defend himself by shooting the animal, his body positioning, the direction the firearm was pointed, and the fact that no human being was in the direction Mr. Deweese pointed his firearm.

116.     The officers knew or should have known that shooting an animal is not the same

as threatening or shooting a police officer or other human being; it cannot reasonably be viewed as a threat to human life.

117.    The officers knew or should have known that Colorado law permits a person to use deadly force to protect themselves from the threat of serious bodily injury.

118.    The officers knew or should have known that the canine attack represented a clear threat of serious bodily injury to any reasonable person in Mr. Deweese's position.

119.    Mr. Deweese never voluntarily turned his weapon toward the officers or otherwise fired at them.

120.    Defendant LeBaron fired immediately upon seeing Mr. Deweese's gun aimed at the canine.

121.    Defendant LeBaron admitted that he fired because he saw Mr. Deweese point the firearm at the canine and thought he was going to shoot the dog.

122.    Defendant LeBaron exhausted his clip, firing all 18 of the bullets loaded into his firearm.

123.    Following Defendant Hancock, all three of the other Defendant officers opened fire, together shooting 40-50 times, and hitting Mr. Deweese 22 times.

124.    Mr. Deweese lived for a short time, struggling to breathe, gasping, and losing four liters of blood.

125.    Mr. Deweese died of exsanguination and internal damage caused by the bullets, as he was being cared for by paramedics who arrived a short time later.

## FIRST CLAIM FOR RELIEF[2]
### *Excessive Force, Conspiracy, and/or Failure to Intervene regarding canine force*
**Pursuant to 42 U.S.C. § 1983, Fourth Amendment, and C.R.S. §13-21-131, Colo. Const. Art. II**
**(Against All Defendants)**

126.    Plaintiff fully incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

127.    Defendant Hancock intentionally and knowingly applied unnecessary, unreasonable, and excessive force to Mr. Deweese by ordering his canine to attack and bite Mr. Deweese, at a time when Mr. Deweese was not threatening, resisting, or fleeing from arrest, and after 20 minutes had passed where Mr. Deweese showed no threatening or actively resistive conduct.

128.    At the time the canine force was used, all officers knew that Mr. Deweese was not in a position to flee from the officers, as the officers blocked the primary pathway out of the area and were on guard for any movement in that direction.

129.    At the time the canine force was used, Hancock and the other three defendant officers had discussed, or otherwise understood, a common plan to use the dog.

130.    Each officer actively participated in close proximity to the canine and with other officers, and/or failed to timely intervene to stop the dog from being used to attack Mr. Deweese.

---

[2] Both claims for relief are brought, in part, pursuant to C.R.S. § 13-21-131, which created for the first time a cause of action in Colorado for the deprivation of rights secured by Article II of the Colorado Constitution. As a newly enacted statute announcing a new cause of action, the law is not established, and in many cases nonexistent, regarding the contours and legal requirements of any claim brought pursuant to C.R.S. § 13-21-131 and Art. II of the Colorado Constitution. This claim presents an issue of first impression yet to be determined or addressed by the Colorado supreme court. These claims are good faith, non-frivolous claims made pursuant to the newly enacted C.R.S. § 13-21-131. *See* C.R.S. § 13-17-201(2).

131.     Even if the officers were justified in using some level of force to detain/arrest Mr. Deweese, the force used was wholly unnecessary and reached a quantum above and beyond that reasonably necessary to effectuate a lawful detention/arrest under the circumstances.

132.     The canine force used by the officers unreasonably and artificially created any perception of danger that the officers may have believed was present, which led to the unnecessary and excessive use of deadly force against Mr. Deweese, without reasonable justification.

133.     The actions described herein of all four Defendant officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Fourth Amendment to the United States Constitution, and Article II of the Colorado Constitution, including the right to be free from unreasonable seizures, and was the motivating and proximate cause of Plaintiff's injuries, including the deadly physical, emotional, economic, and dignitary harms that were inflicted.

<u>SECOND CLAIM FOR RELIEF</u>
*Excessive Use of Deadly Force*
**Pursuant to 42 U.S.C. § 1983, Fourth Amendment, and C.R.S. §13-21-131, Colo. Const. Art. II**
**(Against All Defendants)**

134.     Plaintiff fully incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

135.     At the time the officers conspired and/or coordinated to participate in the common use of the canine to attack and "rush" Mr. Deweese, the officers knew or should have known that they were threatening Mr. Deweese with serious bodily injury that would likely force Mr. Deweese to defend himself.

136.     Each of the Defendant officers knew that Colorado law permitted Mr. Deweese to

use force to defend himself from serious bodily injury and that any reasonable person would likely take action to defend themselves from such force.

137.    Each of the Defendant officers knew that Mr. Deweese had not presented any threat to the officers, but had warned them that if the dog was sent in to attack, he would defend himself by shooting the animal.

138.    Mr. Deweese acted in a defensive manner as the dog ran up and attacked him, at first retreating backward and then around a 90-degree turn in the path to get away from the canine, before finally resorting to use of his firearm when he had no other reasonable option to avoid serious and potentially catastrophic physical injury from a canine mauling.

139.    As the canine continued with its attack, each of the Defendant officers were in a position to see and understand that Mr. Deweese backed up and tried to avoid the animal, turned perpendicular away from the animal and them, and was not in a position to, nor did he, act in a manner evidencing an intent to threaten or harm the officers.

140.    To the extent that the officers perceived a threat from Mr. Deweese during the time he pulled out a firearm, aimed it at the animal, or shot the animal, it was by their own unreasonable conduct and creation, sending the dog to attack a non-threatening man, which consequences were obvious and foreseeable.

141.    Because Mr. Deweese aimed his firearm at the police canine, the officers fired their weapons over 40 times and shot and killed Mr. Deweese.

142.    The actions described herein of all four Defendant officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Fourth Amendment to the United States Constitution, and Article II of the Colorado

Constitution, including the right to be free from unreasonable seizures, and was the motivating and proximate cause of Plaintiff's injuries, including the deadly physical, emotional, economic, and dignitary harms that were inflicted.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants, and prays for relief from the Court against the Defendants, including:

1. Non-Economic damages for loss of life, loss of quality of life, hedonic deprivation, pain and suffering, emotional distress, etc.;

2. Economic damages for lost wages and earning capacity, medical and funeral expenses, etc.;

3. Punitive Damages as allowed by law;

4. Pre-Judgment and Post-Judgment interest as allowed by law;

5. Attorney's Fees as provided by law;

6. Costs and Expenses; and,

7. Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL TO A JURY
ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 10th day of April, 2024.

CIVIL RIGHTS LITIGATION GROUP, LLP

s/ Raymond K. Bryant
s/ Luke W. McConnell
***Raymond K. Bryant, Reg. 42586***
***Luke W. McConnell, Reg. 40414***
1543 Champa St., #400
Denver, CO 80202
P: 720-515-6165
F: 720-465-1975
E-mail: raymond@rightslitigation.com

E-mail: luke@rightslitigation.com