IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:24-cv-00960-DDD-NRN

ESTATE OF WILFORD DEWEESE,

    Plaintiff,

v.

RONNIE HANCOCK,
DANIEL LEBARON,
LEVI HOOVER, and
JEFFREY SCHUELKE,

    Defendants.

## ORDER GRANTING MOTIONS TO DISMISS

This case arises out of the fatal shooting of Wilford Deweese by police officers in the mountainside town of Manitou Springs, Colorado. Mr. Deweese's estate claims this shooting—and the preceding use of a canine to try to secure his arrest—violated his Fourth Amendment right to be free from the use of excessive force. Defendants have moved to dismiss Plaintiff's complaint. Because Plaintiff has failed to show that their actions violated clearly established law, Defendants' motions must be granted and Plaintiff's claims dismissed.

- 1 -

## BACKGROUND[1]

As alleged in the complaint, Mr. Deweese was a 67-year-old man from Florida who was returning from a cross-country trip between Florida and California when the events in question occurred. Dkt. 1 at ¶¶17; 19. "On the way back from California, Mr. Deweese stopped in Manitou Springs, Colorado and stayed in an AirBnB rental." *Id.* at ¶ 20.

On the evening of April 11, 2022, Mr. Deweese went out to a bar in Manitou Springs called the Royal Tavern, where he "ordered a single 8 oz beer and attempted to play pool." *Id.* at ¶¶ 23–27. His estate claims he "appeared very out of place to locals," who viewed him as "upper-crusty" and "well-to-do" based on his "grey hair," "blue and white plaid shirt, blue vest, white/khaki slacks, and a fisherman's hat." *Id.* at ¶¶25–26. At some point during his time at the bar, the bartender "took offense" to a comment he had made and "decided not to serve Mr. Deweese any longer." *Id.* at ¶¶ 28–32. "Mr. Deweese paid his tab and left peacefully." *Id.* at ¶ 33.

"Mr Deweese then went to another bar blocks away, called the Keg." *Id.* at ¶ 34. "The bartender at the Keg took one look at Mr. Deweese and decided from his appearance that she did not want him in the bar. She shook her head when he attempted to open the door three separate times and gestured for him to leave." *Id.* at ¶ 36. "Mr. Deweese began walking down the main strip on Manitou Ave. and realized he had left some of

---

[1] The parties disagree about the propriety of considering the bodycam and witness footage attached to Dkt. 26 at this stage of litigation. Dkt. 38 at 3–6; Dkt. 42 at 2–3. Though the outcome here would not be changed were I to disregard the footage altogether, I have reviewed it and determined that it does not conflict with any of the allegations in the complaint. To the extent that Defendants offer their own version of facts ostensibly based on this footage, I have not considered this in reaching this decision. *See* Dkt. 26 at 2–5.

his belongings in the Royal Tavern." *Id.* at ¶ 39. "Mr. Deweese returned to the Royal Tavern to get his things." *Id.* at ¶ 40.

"When Mr. Deweese walked in, he was confronted by the bartender who told him she was not going to serve him and that he had to leave." *Id.* at ¶ 41. "An argument erupted between the two and the bartender attempted to push him out of the establishment." *Id.* at ¶ 42. A local patron then "approached Mr. Deweese from behind and pushed him, knocking Mr. Deweese to the ground." *Id.* at ¶ 43. "Mr. Deweese stood up and attempted to pull a gun from out of his pocket to show that he could defend himself from what appeared to be an overwhelming crowd of hostiles." *Id.* at ¶ 44. "At the first sight of the weapon, the bartender yelled 'he's got a gun, call 911.'" *Id.* at ¶ 46. "Someone called 911 and police were dispatched." *Id.* at ¶ 49.

After he left the Royal Tavern for the second time, "Mr. Deweese walked several blocks down Manitou Avenue, toward a local art installation and courtyard in the center of town around 900 Manitou Ave." *Id.* at ¶ 50. "It was at this courtyard. . . that police officers found Mr. Deweese." *Id.* at ¶ 52.

"When they arrived, Manitou Springs police officers Defendants Hoover and Schuelke pulled their police vehicles over and parked on the street in front of Mr. Deweese, and immediately pulled out their firearms—one handgun and one rifle—and pointed them at Mr. Deweese." *Id.* at ¶ 53. The police officers yelled out a number of commands to try and secure Mr. Deweese's arrest, including "turn away" and "walk toward me," but Mr. Deweese did not move. *Id.* at ¶¶ 55–59. "Mr. Deweese continued to stand idle for nearly 20 minutes[.]" *Id.* at ¶ 64.

At some point during this standoff, Officer LeBaron "joined Officers Hoover and Schuelke and brought along his body-length shield." *Id.* at ¶ 71. And "[a]pproximately 13 minutes after officers Hoover and

- 3 -

Schuelke made contact with Mr. Deweese, Defendant officer Hancock arrived with his K-9 Jinx." *Id.* at ¶ 73. Officer Hancock "yelled out that if Mr. Deweese did not walk out with his hands up, he would send the dog in to bite him." *Id.* at ¶ 83. "After the officers yelled that he would be bitten if he did not walk out, [Mr. Deweese] yelled clearly that he would defend himself if forced to by shooting the dog if it was sent to attack him." *Id.* at ¶ 87.

After about twenty minutes of waiting, and seven minutes after the canine arrived on the scene, "the Defendant officers, together, decided to end the situation with force and send in the dog to attack, while they 'rushed' in behind the canine with only firearms ready." *Id.* at ¶ 90. As the canine charged around a corner, Mr. Deweese "pulled a small handgun from his pocket," aimed "toward the attacking dog, and fired it." *Id.* at ¶ 111. The officer Defendants then opened fire on Mr. Deweese, hitting him 22 times. *Id.* at ¶ 123. Mr. Deweese died on the scene. *Id.* at ¶ 125.

On April 9, 2024, Mr. Deweese's estate filed suit in this case, alleging that the Defendant officers violated the Fourth Amendment's prohibition against excessive force when they released a canine on Mr. Deweese and then shot him to death after he opened fire on the canine. *Id.* at ¶¶ 126–142. The estate also alleged that the Defendant officers unconstitutionally failed to intervene to stop the dog from being used to attack Mr. Deweese and that the Defendants' actions violated the Colorado constitution. *Id.* Defendants moved to dismiss on August 9, 2024. Dkt 24; 26.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) requires a court to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."

- 4 -

*Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). A court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* At this stage, the well-pleaded facts underlying a plaintiff's allegations must articulate a viable legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.

## DISCUSSION

It is no doubt a tragedy that what began as an evening out in a picturesque tourist town wound up with both a police canine and a human being shot dead. And it may be true, as Plaintiff suggests, that both would still be alive had the defendants named here employed "other reasonable non-force options"—such as "engaging in a real back and forth dialogue, answering questions to gain trust and ensure security, insulating themselves with available body armor, using ballistic shields on scene to slowly gain safe distance," "approaching from behind in stealth," or "simply and straight-forwardly" approaching him in a "non-threatening manner"—before they released the canine and the fatal

- 5 -

shootout ensued. Dkt. 38 at 14. But whether, with the benefit of hindsight from the relative "peace of a judge's chambers," there were other, possibly better, options is not the inquiry here. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The question before me is not whether the police could or should have taken other measures in some general sense, but whether the measures they did take were so clearly constitutionally impermissible that no reasonable officer could have concluded otherwise. *See id.*; *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it.") (quotation marks omitted). The facts alleged do not support that conclusion, so Defendants' motions must be granted and Plaintiff's claims must be dismissed.

### I.   Qualified Immunity

In order to overcome a defense of qualified immunity, a plaintiff must establish both "that the defendant's conduct violated a federal constitutional or statutory right" and "that the right was clearly established at the time of the conduct." *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003). Judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here the second prong is dispositive.

Plaintiff has alleged two separate claims[2]—one premised on the use of the canine and one on the subsequent use of deadly force—but the key question is whether the Defendants are entitled to qualified immunity with respect to the use of the canine. That is because the latter claim depends on the former: if it was clearly established that it was unreasonable or reckless for Defendants to release a canine to subdue Mr. Deweese under the circumstances of this case, then they were not entitled to use lethal force in response to a danger they themselves unreasonably created. That is because police may not "recklessly cause the need to use deadly force." *Estate of Alire v. Wilhera*, No. 23-1213, 2024 WL 5183300, at *4 (10th Cir. Dec. 20, 2024).

On the other hand, if it was *not* clearly established that Defendants acted unconstitutionally by releasing the canine, then there is no doubt that they were entitled to use lethal force once Mr. Deweese drew his gun and started firing. *See, e.g., Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("a reasonable officer need not await the glint of steel before taking self-protective action.") (cleaned up). Likewise, Defendants can have had no duty to intervene to stop the canine if it was not clearly established that its use was unconstitutional. The outcome of this case thus hinges on whether the Defendants are entitled to qualified immunity with respect to their use of the canine.

### A. Use of police canine

Whether a law is clearly established for the purposes of qualified immunity depends on whether a "reasonable official in the defendant's

---

[2] While the complaint states two claims, they each are brought under a variety of federal and state sources, including 42 U.S.C. § 1983, Fourth Amendment, and C.R.S. §13-21-131, Colo. Const. Art. II. *See* Dkt. 1 at 22–23. My analysis below is limited to the federal claims; as noted below, the state claims will be dismissed without prejudice to refile in state court. *See* 28 U.S.C. § 1367(c)(3).

circumstances would understand that her conduct violated the plaintiff's constitutional right." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006). Though "a general constitutional rule identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 586 U.S. 38, 503 (2019) (cleaned up). And the Tenth Circuit has clarified both that the "dispositive question is whether the violative nature of *particular* conduct is clearly established," *Aldada v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (emphasis in original; quotation marks omitted), and that "existing precedent must have placed the statutory or constitutional question beyond debate." *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015) (quotation marks omitted). The Circuit has also emphasized that "[i]t is particularly important that a Fourth Amendment right be clearly established in a specific factual scenario because it can be difficult for an officer to determine how the prohibition against excessive force will apply in novel situations." *Arnold v. City of Olathe*, 35 F.4th 778, 793 (10th Cir. 2022).

I note initially that a number of the cases Plaintiff cites do not satisfy the criteria necessary to qualify as clearly established law. For example, Plaintiff cites six district court cases for the proposition that it "is clearly established in the Tenth Circuit that a police officer may not use significant force on a non-violent, non-resistant suspect who is accused of only minor, non-violent crimes." Dkt. 37 at 13–15. Even if this statement of the established law is not the sort of highly general proposition that the Court has emphasized cannot serve as the basis for holding officers liable, Plaintiff's lower court cases are inapplicable to this analysis. *See T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) ("A plaintiff may

- 8 -

show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation.");[3] *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.").[4]

Plaintiff also claims that *Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020), clearly establishes that Defendants' conduct was unreasonable here despite the fact that this case was reversed by the Supreme Court. 595 U.S. 9. Even if in theory a decision reversed by the Supreme Court could clearly establish the law, it does not here because on remand the Tenth Circuit vacated its earlier judgment and instructed

---

[3] The Supreme Court has in fact called into question whether even circuit court decisions can constitute clearly established law. *See, e.g.*, *City of Escondido*, 586 U.S. at 43 (2019) ("Assuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity. . ."); *Kisela v. Hughes*, 584 U.S. 100, 106 (2018) (per curiam) ("[E]ven if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here.") (citation omitted); *Pina v. Estate of Jacob Dominguez*, 604 U.S ___, ___ (Mem.) (2025) ("Even if it is assumed that controlling Circuit precedent may constitute clearly established law. . .") (Alito, J., dissenting in denial of certiorari).

[4] Plaintiff has also not shown how this general statement of the law would apply here, where the decedent was actively resisting law enforcement commands for about twenty minutes. *See, e.g.*, *Anderson v. DelCore*, 79 F.4th 1153, 1165 (10th Cir. 2023) (holding that "resistance need not be physical" and clarifying that active resistance includes "when an individual refuses to obey an officer's lawful orders"); *see also Helvie v. Jenkins*, 66 F.4th 1227, 1238 (10th Cir. 2023) (holding that officers' commands "would be hollow" unless "they can use reasonable force to execute those orders"); *Cf. Luethje v. Kyle*, No. 24-1257, 2025 WL 851085, at *7 (10th Cir. Mar. 19, 2025) (finding caselaw prohibiting warrantless entries applied with "obvious clarity" to releasing a canine into a house based solely on information that "a suspect had broken a window and then run away").

the district court to grant the officer defendants' motions. *Bond v. City of Tahlequah*, No. 19-7056, 2022 WL 227098, at *1 (10th Cir. 2022); *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979) ("Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect.") (cleaned up).

That leaves Plaintiff with two cases that could potentially establish the clear illegality of Defendants' actions here—*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). Plaintiff claims these cases stand for the proposition that "the reckless manner in which [Defendants] approached [Deweese] and [their] precipitous resort to lethal force violated clearly established Fourth Amendment law," Dkt. 38 at 17 (quoting *Estate of Ceballos*, 919 F.3d at 1220), and therefore establish that Defendants were in clear violation of the Constitution when they released the canine on Mr. Deweese. That is not so.

As it happens, *Allen* is one of the cases that the Supreme Court considered when it determined that there was no violation of clearly established law in *City of Tahlequah*. It noted there that while "the officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands," the officers in *City of Tahlequah* "by contrast, engaged in a conversation with [the decedent], followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer." *City of Tahlequah*, 595 U.S. at 13. This case is more like the latter than like *Allen*. As in *City of Tahlequah*, the record is clear that the officers attempted to speak with Mr. Deweese for some twenty minutes before they ever deployed any force. In *Allen*, by contrast, "[t]he entire sequence, from the time [Defendant] arrived to the time [decedent] was killed, lasted approximately ninety seconds." 119 F.3d at 839. Further,

while *Allen* involved a suicidal suspect whose known mental illness required a modified response from law enforcement, there is nothing in the complaint to indicate that Mr. Deweese was mentally ill or obviously intoxicated. *Cf.* Dkt. 1 at ¶ 27 ("At the Royal Tavern, Mr. Deweese ordered a single 8 oz beer.").

*Estate of Ceballos*, like *Allen*, involved a suspect whose "capacity to reason was diminished, whatever the underlying reason might have been—mental health problems, emotional distress, drunkenness, or drugs." 919 F.3d at 1217. Also like in *Allen*, the defendant police officers in *Estate of Ceballos* "shot and killed [the] emotionally distraught [decedent] within a minute of arriving on scene." *Id.* at 1216. Neither of those factual features is present here. The fact that Ceballos was "in his own driveway" at the time of the shooting and "posed harm to no one" also meaningfully distinguishes that case from this one, where Mr. Deweese was in public, in a central part of town near at least some bystanders, and had already brandished his gun at the Royal Tavern, resulting in the bartender calling 911. Dkt. 1 at ¶¶ 44–46. Under the totality of these circumstances, it was not unreasonable for the Defendants to fear that Mr. Deweese—and the possibility that an errant bullet fired from his gun might hit an onlooker—posed a significant risk to public safety. *See, e.g., Graham*, 490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.") (quotation marks omitted).

The burden on a plaintiff to overcome the doctrine of qualified immunity is a heavy one, and it can, at times, appear unjust. But it is the law that must be applied, and in light of the totality of the circumstances here, Plaintiff has failed to carry its burden to show that *Allen* and

*Estate of Ceballos* clearly established that the Defendants in this case acted in violation of the Constitution when they released the canine towards Mr. Deweese. *See City of Tahlequah*, 595 U.S. at 14 ("Suffice it to say, a reasonable officer could miss the connection [those] case[s] and this one.").

### B. Use of deadly force

Once it is established that the release of the canine was not a clear constitutional violation, Plaintiff's other claims must also fail. With respect to the shooting itself, there is nothing to support the conclusion that it is clearly unreasonable for officers to shoot at an individual who has pulled out a gun and is actively shooting at a police dog. Though Plaintiff at times seems to suggest that it was unreasonable to shoot Deweese after he opened fire on the canine, because his "right arm [was] indisputably aimed away from the approaching officers, toward the dog/building," that is just the kind of judicial second-guessing that the Supreme Court has forbidden. Dkt. 38 at 13. "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'" *Sheehan*, 575 U.S. at 612 (quoting *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 298–299 (1967)). Once Deweese produced his gun and started shooting, it would have only taken a fraction of a second for him to turn towards the officers and start shooting at them too. *See id*. ("The Constitution is not blind to the fact that police officers are often forced to make split-second judgments.") (quotation marks omitted). There is no case law establishing that it is unconstitutional to use deadly force under these circumstances. In fact, the Tenth Circuit has specifically held that "a reasonable officer need not await the glint of steel before taking self-protective action." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (cleaned up).

Because the officers did not recklessly create the need for lethal force by releasing the canine, they are entitled to qualified immunity in this respect too. And because it was not clearly established that the force used in this case was excessive, it necessarily cannot have been clearly established that other officers had any duty to intervene.

## II. Remaining State Law Claims

Having granted the defendants' motions to dismiss as to all of Plaintiff's federal claims, it would be improper to exercise jurisdiction over any remaining state claims, particularly where at least some of those claims are based on a relatively new state law whose contours have not been fully developed. *See* 28 U.S.C. § 1367(c)(3); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

## CONCLUSION

It is ORDERED that:

Defendants' Motions to Dismiss, **Dkt. 24** and **26**, are **granted**; and

All claims in this action are **dismissed without prejudice**.

DATED: March 21, 2025      BY THE COURT:

Daniel D. Domenico
United States District Judge